UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TARA KRAUSE,

    Plaintiff,                                  Civil Action No. 12-14890

v.                                                HON. NANCY G. EDMUNDS
                                                     U.S. District Judge
                                                     HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL             U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Tara Krause brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Insurance under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on April 6, 2010, alleging disability as of May 1, 2009 (Tr. 147-153, 154-157). After the initial denial of benefits, Plaintiff requested an administrative hearing, held May 31, 2011 in Mount Pleasant, Michigan (Tr. 34). Administrative law judge ("ALJ") Jessica Inouye presided. Plaintiff, represented by attorney John Wildeboer, testified (Tr. 40-82), as did Vocational Expert ("VE") Timothy Shaner (Tr. 83-85). On June 23, 2011, ALJ Inouye found Plaintiff not disabled (Tr. 29). On August 28, 2012, the Appeals Council

denied review (Tr. 1-3). Plaintiff filed her complaint in this Court on November 2, 2012.

## BACKGROUND FACTS

Plaintiff, born March 2, 1983, was 28 at the time of the administrative decision (Tr. 29, 147). She completed high school (Tr. 175) and worked previously as a cashier, counter associate, customer service provider, and lawn and garden associate (Tr. 171). She alleges disability due to bipolar disorder, a social anxiety disorder, and a general anxiety disorder (Tr. 170).

### A. Plaintiff's Testimony

Plaintiff offered the following testimony:

She currently lived in an apartment in Bay City, Michigan with her eight-year-old son (Tr. 41). She last worked in December, 2009, noting that she quit the job due to anxiety (Tr. 42). Symptoms of anxiety included heart palpitations and breathing problems (Tr. 43). Her anxiety attacks could be brought on by the presence of either strangers or individual known to her (Tr. 43-44). While working as a cashier, she was usually able to complete a transaction after the onset of an attack, but would then require a work break allowing her to "get some air" (Tr. 44-45). She held unskilled jobs successively at Walmart, Staples, and K-Mart, but quit all of them due to anxiety (Tr. 46-49). Her anxiety was not limited to social interaction, but sometimes occurred while she was at home by herself (Tr. 49). She opined that working a night shift (requiring minimal interaction with others) would not prevent her from having anxiety attacks (Tr. 49). Anxiety attacks also created physical symptoms such as low oxygen intake (Tr. 50). She did not experience significant symptoms of anxiety during a stint as a cleaner, but quit because she did not get along well with her coworkers (Tr. 51). During the period in which she worked as the night shift as a baker's helper, she did not experience social anxiety, but was anxious because she was working alone (Tr. 52). Her

decision to leave the bakery position was also attributable to the birth of her son (Tr. 53). She quit a medical assistant training program due to social anxiety (Tr. 53).

Plaintiff did not experience problems in reading, writing, or performing simple calculations (Tr. 53). She was able to drive (Tr. 54). She received food stamps and financial support from her mother (Tr. 55). She experienced bipolar disorder and agoraphobia, noting that she played with her son in their back yard, but was uneasy taking a short walk to the mailbox (Tr. 57). She was able to attend her son's Little League games accompanied by her mother and regularly attended parent-teacher conferences (Tr. 58). She received a diagnosis of either Attention Deficit Disorder ("ADD") or Attention Deficit Hyperactivity Disorder ("ADHD") but declined to take medication for the condition due to drug interactions with other psychotropic medication (Tr. 59). She was unable to paint, read, or perform household chores for more than 20 minutes at a time due to ADD or ADHD (Tr. 60). She attended medication reviews each month, but no longer attended weekly therapy due to transportation problems after her car was totalled (Tr. 61-62). She disputed August and September, 2010 therapy records stating that she terminated treatment after being told to look for a job and stop "partying" (Tr. 62). She denied problems taking care of her son (Tr. 63-64).

Plaintiff's depressive episodes were characterized by long periods of sleeplessness or alternatively, the need to sleep most of the time (Tr. 65). She also over- or under-ate during depressive episodes (Tr. 67). During bouts of sleeplessness, she would experience audial hallucinations (Tr. 65-66). She reiterated that anxiety caused breathing problems (Tr. 68-71). Because she experienced anxiety while grocery shopping and going to mall, she limited her outings to taking her son to the park (Tr. 72). She denied going to church or dining out (Tr. 73). She denied alcohol consumption in the past six months, but previously had approximately two alcoholic beverages each month (Tr. 74-75). She used marijuana in May,

2009 and admitted to using cocaine once (Tr. 75-76). She denied current misuse of Xanax, but acknowledged a previous overdose (Tr. 76). She currently took Xanax, Wellbutrin, Lamictal, and Seroquel as prescribed (Tr. 76). She experienced memory loss as a result of Xanax (Tr. 77).

In response to questioning by her attorney, Plaintiff stated that anxiety precluded the use of public transportation (Tr. 78). The severity of her anxiety would preclude the performance of any of her former jobs (Tr. 78-79). She lacked the motivation to get out of bed on approximately 15 days each month (Tr. 80).

**B. Medical Records**

**1. Records Pertaining to Plaintiff's Treatment[1]**

April 30, 2008 treating records by therapist Valerie R. Daly state that the process of diagnosing and treating symptoms of bipolar disorder were stymied by Plaintiff's "abrupt [cancelation]/ disruption of therapy" (Tr. 332). Daly characterized Plaintiff's attendance as "sporadic" (Tr. 332). In July, 2008, Daly assigned Plaintiff a GAF of 50,[2] noting a diagnosis of anxiety (Tr. 402). April, 2009 therapy notes by Daly state that Plaintiff had become "bored" with her job since breaking up with her boyfriend (Tr. 408). Plaintiff reported that she had just registered for training to become a phlebotomist (Tr. 408). In June, 2009, Plaintiff sought treatment for a sprained ankle (Tr. 339). She was re-prescribed Wellbutrin, Alprazolam, and Ambilify (Tr. 408). Treating records state that she was taking Prozac and Xanax for depression and anxiety (Tr. 339).

---

[1] Records predating the May, 2009 alleged onset of disability by more than 13 months have been reviewed in full, but are omitted from the present discussion.

[2] A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders* at 34 ("*DSM-IV-TR*")(4th ed.2000).

In July, 2009, Plaintiff sought emergency treatment for depression but denied suicidal intent (Tr. 361). She reported feeling "overwhelmed" as a result of losing her job and financial problems (Tr. 361, 417). She acknowledged occasional marijuana and alcohol use (Tr. 361). She was diagnosed with mild depression (Tr. 361). Drug testing showed the overuse of benzodiazepine (Xanax) (Tr. 342, 375). An August, 2009 medication review by Barry D. Binkley, M.D. states that Plaintiff was "bright and cheery" after beginning use of Lamictal (Tr. 405). Plaintiff reported that she had just begun a new relationship (Tr. 405). Dr. Binkley's February, 2010 medication review states that Plaintiff requested a medication adjustment for "mild" mood swings (Tr. 403). Therapy notes from the following month state that Plaintiff was looking for a job as a cashier (Tr. 387). Daly found "mildly impaired" functioning (Tr. 387).

May, 2010, treatment records from Bay-Arenac Behavioral Health show that Plaintiff was treated for a Xanax overdose (Tr. 413). Inpatient hospitalization was deemed inappropriate but Plaintiff was advised to undergo additional outpatient treatment (Tr. 414). Plaintiff reported being depressed after totalling her car two weeks earlier, but denied that she was attempting suicide (Tr. 415). Daly's June, 2010 therapy notes state that Plaintiff's condition had "regressed" due to financial and housing problems (Tr. 459-460).

August, 2010, Bay-Arenac records state that Plaintiff was recommended for inpatient treatment after reporting suicidal ideation and hallucinations (Tr. 423). The same month, psychiatrist Michael Ingram performed an examination of Plaintiff, noting past alcohol and illicit drug abuse (Tr. 429). Plaintiff denied visual hallucinations but opined that others "were out to get her" (Tr. 430). Dr. Ingram assigned Plaintiff a GAF of 41 and recommended inpatient treatment of several days duration (Tr. 431). Daly found "mild" impairment in daily activities, social functioning, and impulse control (Tr. 466). Later the

same month, psychiatrist Kishore Kondapaneni, M.D. performed an assessment of Plaintiff's condition, opining that she should reduce her use of Xanax and continue counseling with Daly (Tr. 470). In September, 2010, Daly noted that Plaintiff terminated therapy with List Psychological Services after being advised to find work, go back to school, and quit "nightlife/'partying'" (Tr. 465). The following month, Dr. Kondapaneni noted that Plaintiff appeared anxious and mildly depressed (Tr. 477).

In February, 2011, Plaintiff sought emergency treatment for a left elbow injury and upper extremity and neck pain (Tr. 480-498). Imaging studies showed the absence of a fracture, dislocation, or other abnormalities (Tr. 487, 495). In April, 2011, Dr. Kondapaneni completed an assessment of Plaintiff's work related activities, finding marked limitations in coping with stress, dealing with the public, and maintaining concentration, persistence, or pace (Tr. 499-500). He found that Plaintiff experienced three separate episodes of decompensation (Tr. 500).

**2. Other Medical Evidence**

In September, 2009, Bruce G. Douglass, Ph.D. performed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff's treating records on behalf of the SSA, finding the presence of mild limitations in activities of daily living and moderate limitations in social functioning and concentration, persistence, or pace as a result of bipolar disorder (Tr. 347). He found that Plaintiff experienced moderate limitations in understanding, remembering, and carrying out detailed instructions; maintaining a work schedule; and completing a workweek without psychologically based interruptions (Tr. 349-349). Dr. Douglass found the presence of alcohol abuse, but determined that it was not material to the disability claim (Tr. 351).

On August 10, 2010, Mark Zaroff, Ph.D. performed a consultative psychological

examination on behalf of the SSA (Tr. 434-44). Plaintiff reported that she currently attended therapy and had two close friends (Tr. 435). She indicated that she arose at 8:00 a.m., played with her son, and made breakfast (Tr. 436). Dr. Zaroff noted that Plaintiff exhibited good grooming and was in contact with reality but had poor self esteem (Tr. 436). He also noted poor motivation and "over-focus" on symptoms (Tr. 436). Plaintiff denied hallucinations or suicidal ideation (Tr. 436). She appeared fully oriented (Tr. 437). Dr. Zaroff assigned Plaintiff a GAF of 45 with a poor prognosis, but found that she was capable of managing her benefit funds (Tr. 438).

Later the same month, Wayne Hill, Ph.D. performed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment on behalf of the SSA, finding the presence of bipolar disorder and anxiety (Tr. 444). He found mild limitation in activities of daily living and concentration, persistence, and pace, and moderate limitation in social functioning (Tr. 444). He found no episodes of decompensation (Tr. 444). He found Plaintiff's claims of limitation "partially" credible, noting that she did not experience significant limitation in activities of daily living, including the ability to leave her home (Tr. 445). Dr. Hill found "social interaction" limitations but determined that Plaintiff did not experience limitations in interacting with coworkers (Tr. 446). He found moderate limitations in the ability to adapt to workplace changes and avoiding hazards (Tr. 446). He noted that plastic surgery for chin reconstruction illustrated Plaintiff's ability to "plan" and her concern about appearing attractive to others (Tr. 447). Dr. Hill concluded that Plaintiff could "perform one and two-step tasks on a sustained basis" (Tr. 447).

### C. Vocational Testimony

VE Timothy Shaner classified Plaintiff's past relevant work as a baker helper as

exertionally medium[3] and unskilled and cashier as light/unskilled (Tr. 82, 261). The ALJ then posed the following hypothetical question, taking into account Plaintiff's age, education, and work experience (Tr. 83).

> This hypothetical individual would require work which is non-production-oriented, simple, unskilled, with an SVP of 1 or 2.[4] This individual should not work in close proximity to coworkers, meaning the individual could not function as a member of a team. This individual should have minimal direct contact with the public. This job should essentially be isolated with only occasional supervision. This individual should perform a low-stress . . . work . . . with only occasional changes in the work and occasional decision-making. This individual may need to make notes to aid memory. This individual should avoid concentrated exposure to hazards. Can this hypothetical individual perform the claimant's past work?

The VE testified that the above restrictions would preclude Plaintiff's past work, but would allow the hypothetical individual to perform the light, unskilled work of a housekeeper (8,700 positions in existence in the regional economy, Dictionary of Occupational Titles ("DOT") number 323.687-014; stock clerk (6,900), DOT number 209.587-034; and mail clerk (1,500), DOT number 209.687-026 (Tr. 84). The VE testified that if the hypothetical restrictions were amended to preclude all contact with coworkers, allow the individual to be off task "30 percent or more of the time," or, an absenteeism of more than three times a

---

[3] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

[4] SVP measures the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."DOT, Appendix C, http://www.occupationalinfo.org/appendxc1.html#II (last visited on December 31, 2013). A job with an SVP rating of two corresponds to a job that a typical worker can perform after "anything beyond short demonstration up to and including 1 month." *Id.* An SVP of 1 or 2 refers to unskilled work. SSR 00-04p.

month, no jobs would be available (Tr. 84). He concluded by stating that his testimony was consistent with the information found in the DOT (Tr. 84).

### D. The ALJ's Decision

Citing the medical records, ALJ Inouye found that Plaintiff experienced the severe impairments of "bipolar, generalized anxiety disorder ("GAD"), and a history of poly-substance abuse," but that none of the conditions met or medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 22). She found the presence of moderate limitation in activities of daily living and concentration, persistence, or pace and marked limitations in social functioning (Tr. 22).

The ALJ found that Plaintiff had the following Residual Functional Capacity ("RFC"):

> [A] full range of work at all exertional levels but can only do so with accommodations for several non-exertional limitations. The claimant cannot perform work that is fast-paced or production-oriented. She can perform work that is simple and unskilled, with an SVP (1) or (2), as defined by the Dictionary of Occupational Titles. The claimant cannot work in close proximity to other workers and, therefore, cannot function as a member of a team. The claimant should have no more than minimal direct contact with the public. The claimant can perform low-stress work with no more than occasional supervision in an essentially isolated work environment with no more than occasional workplace changes and/or decision-making requirements. The claimant must be permitted to make and use notes to aid in memory retention while at work. The claimant should avoid concentrated exposure to workplace hazards.

The ALJ rejected Plaintiff's alleged degree of psychological and social limitation, noting that Plaintiff lived alone and was able to take care of her son (Tr. 27). The ALJ also noted that therapy records undermined her claim of disabling social anxiety (Tr. 27). On a related note, the ALJ found that the treating records showing the presence of poly-substance abuse stood at odds with Plaintiff's testimony (Tr. 27).

**STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

**FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

Plaintiff presents eight arguments in favor of remand. *Plaintiff's Brief, Docket 21*. First, she contends that the ALJ erred by discounting Dr. Kondapaneni's April, 2011 assessment, and second, erred by discounting Dr. Ingram's August, 2010 opinion. Third, she argues that the ALJ misinterpreted Dr. Zaroff's findings. Plaintiff argues fourth that the finding that she was non-compliant with her treatment is not supported by the record. Fifth, she contends that the ALJ's reliance on the December, 2009 and August, 2010 consultative and non-examining findings was erroneous, given that these sources did not have benefit of the opinions of Drs. Kondapaneni and Ingram.

In her sixth argument, Plaintiff argues that the credibility determination was based on a slanted view of her testimony and the treating records. On a related note, she argues seventh that her ability to care for her son and unsuccessful work attempts were erroneously cited to discount her allegations of disability. Eighth, she argues that the finding that she had a history of polysubstance abuse was not supported by the record.

Arguments relating to Plaintiff's credibility (arguments six through eight) will be considered first. Arguments as to whether the ALJ misread Dr. Zaroff's findings or whether

Plaintiff was non-compliant with treatment recommendations (arguments three and four) can be considered together. Finally, Plaintiff's argument that the ALJ erred by discounting Drs. Kondapaneni's and Ingram's opinions (arguments one and two) will be considered along with Plaintiff's contention that these opinions were improperly given less weight than earlier, non-treating opinions (argument five).

### A. The Credibility Determination (Arguments Six through Eight)

Plaintiff disputes the ALJ's finding that testimony regarding the work related effects of anxiety was "'equivocating and largely non-responsive.'" *Plaintiff's Brief* at 20 (citing Tr. 25)). Plaintiff takes issue with the finding that she was not seeking therapy or mental health services for anxiety, citing Daly's June through September, 2010 therapy records (Tr. 457-466) and records by Dr. Kondapaneni created between September, 2010 and March, 2011 (Tr. 272, 476-480). *Id.* at 21. She argues that her disability claim was improperly discounted on the basis that she was able to care for her school-age son, noting that she relied on her family for help. *Id.* at 21, 25. She objects to the ALJ's reference to her former work as a cashier in support of the non-disability finding, noting that most of her former jobs as a cashier were "unsuccessful work attempts" rather than substantial gainful activity. *Id.* at 23-25). Finally, she argues that the ALJ's finding of polysubstance abuse was not supported by the medical record. *Id.* at 26.

"[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Commissioner of Social Sec.,* 502 F.3d 532, 542 (6th Cir.2007) (citing *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997)). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters,* at 531. *See also Casey*

*v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir.1989) ( *citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986)) (An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record' ").

Plaintiff's criticisms of the credibility determination are largely without merit. The ALJ's observation that Plaintiff "was apparently at a loss as to the cause of her ever present anxiety" (Tr. 25) was made in response to Plaintiff's testimony that anxiety attacks were originally precipitated by fights with her mother, but not since her relationship with her mother had improved (Tr. 25).

The ALJ did not otherwise mis-characterize Plaintiff's testimony. Although Plaintiff claimed that social anxiety prevented her from holding a job requiring interaction with others, she stated that she quit a job as a baker's helper where she had worked by herself because "it was a little overwhelming having to do everything on [her] own" and "that could have brought on a lot of anxiety[] as well" (Tr. 52). She testified that she quit the baker's helper job because of "general anxiety," but acknowledged that she "had a small baby at home at the time and – single mother, that was part of it" (Tr. 53). Plaintiff testified that despite alleged disabling anxiety attacks which occurred without warning, she lived independently, took care of her son's daily needs (Tr. 63-64), attended parent-teacher conferences and little Little League games, and was able to take her son to the park (Tr. 72).

Plaintiff disputes the ALJ's finding that she did not seek treatment for anxiety, noting that the treating records show that she received treatment up until the time of the hearing. *Plaintiff's Brief* at 21-22 (citing Tr. 26). However, the ALJ did not state that Plaintiff had *never* sought treatment for anxiety, but rather that Plaintiff was "not currently in therapy or seeking mental health services . . ." (Tr. 26). The ALJ's observation was taken from

-13-

Plaintiff's testimony that she had a medication review each month but had not attended therapy since her car was totalled an entire year earlier (Tr. 61-62).

Plaintiff takes issue with the observation that she was capable of performing work as a cashier in the past (Tr. 25), arguing that her former jobs as a cashier cannot be classified as substantial gainful activity. *Plaintiff's Brief* at 23-25. However, aside from Plaintiff's present contention that she is incapable of continuing work as a cashier, she acknowledges that she was able to work as a cashier between September, 2005 and May, 2007. *Id.* at 24, (Tr. 171). This argument is also undermined by March, 2010 treating notes stating that one year after the alleged onset of disability, Plaintiff was looking for a job as a cashier (Tr. 387). The ALJ did not err in noting that Plaintiff was able to hold a cashiering job for a significant period or that she spent the longest portion of her career holding cashier positions (Tr. 171).

Plaintiff also disputes the observation that she was able to live independently and take care of son, arguing that her ability to "babysit" should not have been cited as proof of non-disability. *Plaintiff's Brief* at 25-26 (citing *Spiva v. Commissioner,* 628 F.3d 346, 352 (7th Cir. 2010)). However, Plaintiff's testimony alone establishes that she did more than "babysit" her son. She denied difficulties caring for him, testifying that she cooked for him, bathed him daily, and played with him, also testifying that she attended his Little League games and parent-teacher conferences (Tr. 58).

Finally, the ALJ did not err in noting that Plaintiff's polysubstance abuse exacerbated her psychological symptoms (Tr. 23). Plaintiff admitted to former marijuana and cocaine use and at least one deliberate overdose of Xanax (Tr. 75-76, 361, 413). As discussed in more detail below, Dr. Zaroff's observation that Plaintiff's overuse of Xanax contributed to her psychological symptoms, adopted by the ALJ, is well supported by the records (Tr. 438).

**B.   The ALJ's Interpretation of the Treating and Consultative Records (Arguments Three and Four)**

Plaintiff disputes the finding that she was non-compliant with treatment recommendations. *Plaintiff's Brief* at 16-18. She contends that the error was compounded by the ALJ's erroneous reading of Dr. Zaroff's consultative findings. *Id.* at 14-16.

Contrary to this argument, the treating records generously support the finding that Plaintiff was non-compliant with treatment recommendations. April, 2008 treating notes by therapist Daly state that Plaintiff's treatment was hindered by "sporadic" therapy attendance (Tr. 332). July, 2009 drug testing showed the overuse of Xanax (Tr. 342). Plaintiff acknowledged cocaine use in early 2009 (Tr. 429). While in August, 2009, Dr. Kondapaneni advised Plaintiff to resume therapy with Daly (Tr. 470), Plaintiff abruptly terminated therapy sessions after being advised to find work or go back to school and stop "nightlife/"partying" (Tr. 465).

Likewise, the ALJ's interpretation of Dr. Zaroff's findings was not erroneous. Plaintiff takes issue with the ALJ's finding that the GAF of 45 in Dr. Zaroff's report was mitigated by non-compliance with treatment recommendations (Tr. 26 citing 438). However, Dr. Zaroff's conclusion that Plaintiff "is likely to continue struggling with anxiety unless she begins to work specifically in the area of panic control treatment" (Tr. 438) supports the ALJ's conclusion that Plaintiff's lack of diligence in seeking treatment contributed significantly to the low GAF score (Tr. 438). The ALJ's finding that Plaintiff was lax in continuing treatment and was over-reliant on Xanax is well-supported by the treating records (Tr. 332, 342, 465).

Plaintiff's argument that Dr. Zaroff and non-examining assessors Drs. Hill and Douglass did not have benefit of later assessments made by Drs. Ingram and Kondapaneni does not diminish their findings. As discussed below, the ALJ permissibly rejected Drs.

Ingram's and Kondapaneni's opinions on the basis that they were contradicted by other treating records and Plaintiff's own account of her activities. Further, the evidence created after the consultative and non-examining reports were completed is not wholly supportive of the disability claim. Long-term therapist Daly's September, 2010 observation that Plaintiff was unmotivated and Plaintiff's own May, 2011 testimony regarding illicit drug use, prescription drug misuse, and reasons for quitting her job as a baker's helper all support the ALJ's non-disability finding. As noted by the ALJ, Plaintiff's failure to seek therapy after discharging Daly in September, 2010 also supports the ALJ's determination.

### C. The Treating Physician Analysis (Arguments One, Two, and Five)

Plaintiff argues that the ALJ also erred by giving "very little weight" to Dr. Kondapaneni's April, 2011 opinion, contending that the ALJ's reasons for rejecting the treating opinion were based on a distorted view of the medical records. *Plaintiff's Brief* at 5-11. Plaintiff argues similarly that the ALJ's stated reasons for rejecting Dr. Ingram's August, 2010 assessment were not supported by the record. *Id.* at 11-14.

An opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004); C.F.R. 404.1527(c)(2)). Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion. *Wilson,* at 544.

-16-

In addition, "the Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue* 661 F.3d 931, 937 (6th Cir. 2011)(citing 20 C.F.R. § 404.1527(c)(2)). The failure to provide "good reasons" constitutes reversible error. *Wilson,* at 544-446.

Plaintiff's argument that the ALJ did not provide "good reasons" for rejecting Dr. Kondapaneni's April, 2011 assessment is without merit. First, the ALJ's statement that Dr. Kondapaneni's findings, including several marked limitations and multiple episodes of decompensation, were "not consistent with the record" is prefaced by a page-and-a-half discussion of Plaintiff's polysubstance abuse, activities of daily living, ability to care for her son, and failure to continue attending therapy (Tr. 25-27). Dr. Kondapaneni's findings also contradict the long-term therapist Daly's finding that Plaintiff experienced "*mild* mood swings" (Tr. 403)(emphasis added).

Further, the ALJ did not err in noting Dr. Kondapaneni's findings of three extended episodes of decompensation did not rely on the definition found in the Listing of Impairments (Tr. 27); 20 C.F.R. Pt. 404, Subpt. P, App. 1. As used in the Listing of Impairments,"[t]he term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." The August, 2010 recommendation of three to five days of inpatient treatment (Tr. 431), by itself, does not amount to even one episode of extended duration under the applicable regulation.

The ALJ's finding that Dr. Kondapaneni gave inordinate weight to Plaintiff's subjective reports of limitation does not constitute error (Tr. 27). To be sure, "[w]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the

diagnosis and observations of professionals trained in the field of psychopathology. *Brooks v. Commissioner of Social Sec.,* 531 Fed.Appx. 636, 643-644 (August 6, 2013)(citing *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir.1989))(internal punctuation omitted). Nonetheless, the ALJ's conclusion that Dr. Kondapaneni over-relied on Plaintiff's professed limitations is well supported by therapist Daly's finding that Plaintiff's lack of motivation, substance abuse, and unwillingness to make lifestyle changes were responsible for her lack of progress (Tr. 332, 465). As discussed above, Plaintiff's activities, including care for her son, ability to live independently, and job search for positions requiring significant interaction with the public support the ALJ's finding that Dr. Kondapaneni's April, 2011 gave undue weight to Plaintiff's subjective claims.

While Plaintiff argues that Dr. Ingram was a treating source, it is unclear whether Dr. Ingram had established a treating relationship at the time of his August, 2010 evaluation. His opinion would thus be "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994) (citing *Atterberry v. Secretary of Health & Human Servs.,* 871 F.2d 567, 572 (6th Cir.1989)). However, even assuming that Dr. Ingram was a treating source, the ALJ's rejection of his August, 2010 assessment is likewise well explained. The ALJ discredited Dr. Ingram's assessment on the basis that it was inconsistent with the "record as a whole" and, like Dr. Kondapaneni's opinion, "seem[ed] to be a product of an inappropriate degree of deference being given to the claimant's subjective complaints of mental instability" (Tr. 27).

In closing, I note that my recommendation to uphold the Commissioner's should not be read to trivialize Plaintiff's problems. However, because the decision that Plaintiff was not disabled falls within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## **CONCLUSION**

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 13, 2014  s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 13, 2014, electronically and/or by U.S. mail.

s/Michael Williams
Case Manager for the
Honorable R. Steven Whalen